IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

KENNETH C. ANDERSON                                         **PLAINTIFF**

VS.                           CASE NO.: 4:21-cv-04012-SOH

TYSON FOODS, INC.                                   **DEFENDANT**

## COMPLAINT

### Introduction

This is a civil rights action brought pursuant to 42 U.S.C.S. § 2000 *et seq*. (Title VII of the Civil Rights Act of 1964, as amended), and pursuant to the Fourteenth Amendment to the United States Constitution, in order to recover damages against the defendant for the unlawful employment practices that the plaintiff, **KENNETH C. ANDERSON,** has been subjected to on account of his race and in retaliation for having complained about discriminatory treatment. The plaintiff also seeks relief pursuant to 42 U.S.C.S. § 1983, in that the unlawful employment practices were committed by the defendant. This is also an action for declaratory judgment pursuant to 28 U.S.C.S. § 2201 to declare the rights and other legal relations between the parties. The plaintiff is also seeking equitable relief and injunctive relief as well.

### I.

### Jurisdiction

1.     Jurisdiction and venue of this Court are invoked pursuant to 28 U.S.C. §§ 1331, 1343, 1391, 42 U.S.C.S. § 2000e *et seq*. (Title VII of the Civil Rights Act of 1964, as amended)

and the Fourteenth Amendment of the Unites States Constitution, and retaliation for exercising his rights under29 U.S.C.S. § 185 et seq. and pendent jurisdiction under 28 U.S.C.S § 1367.

2.      Venue is proper in the Western District of Arkansas pursuant to 28 U.S.C. S. § 1391(b)(c) as the unlawful employment practices alleged to have been committed against the plaintiff  were committed in the State of Arkansas, and in Howard County, Arkansas, and the defendant conducted business in the district at all relevant times herein.

II.

Parties

3.      The plaintiff Kenneth C. Anderson is an African-American male, and is a resident of the United States of America.

4.      The defendant, Tyson Foods, Inc, is a foreign corporation licensed to do business in the State of Arkansas, and was conducting business in Howard County, Arkansas, at all times pertinent to this cause of action.

5.      The defendant Tyson Food, Inc. is an employer within the meaning of 42 U.S.C.S. § 2000e (b), (g), and (h).

6.      The plaintiff was employed by the defendant, Tyson Food, Inc., in Howard County, Arkansas, as an hourly employee at all times pertinent hereto.

III.

Facts

7.      The plaintiff was hired by the defendant, Tyson Foods, Inc., on October 22, 2018 as a production worker in the Nashville, Arkansas poultry processing plant.

8.      The plaintiff was terminated under the false pretext that he violated the defendant's attendance policy on June 10, 2020.

9.      The plaintiff, in his primary position, was responsible for dumping fifty (50) pound bags of ingredients such as flour and breading for line 8 in the cook room.  The plaintiff was required to wear knee-high, rubber boots and work second shift, Monday through Friday, from 4:30 pm to 1:30 am, and some Saturdays, as production required.  On some Saturdays, the plaintiff would occasionally receive a break from dumping to work on the floor cleaning debris as instructed.

10.     The plaintiff was told that with good performance he would quickly rotate and move upward in the company to other positions.

11.     The plaintiff put forth good work performance and dumped between three hundred (300) and four hundred (400) – fifty (50) pound bags of breading ingredients, per shift, and worked as many as twenty-one (21)) consecutive days.  The job was repetitive and physically demanding, and predominately performed by African American employees that usually quit after a couple of months, and the Caucasian employees would quit after two (2) weeks.

12.     More than one year elapsed and the plaintiff was never moved to another position and was the only African American that held the strenuous position for such length of time.

13.     Over the course of about fourteen (14) months, the plaintiff observed that his white counterparts were moved to other positions with higher pay and better working conditions, including the blender operator, line lead, ingredients room, and maintenance, on an average of two (2) weeks after starting in the same position as the plaintiff.  The blender operator, line lead, ingredients room, and maintenance positions were predominately or exclusively held by Caucasian employees.

14.     The plaintiff began requesting and bidding on the blender operator, line lead, and ingredients room positions more aggressively.

15.     On or about Saturday, December 14, 2019, the plaintiff was instructed by his line supervisor, Shane Stone, a Caucasian male, to work in a floor position cleaning up debris and other contaminants. This position was not a promotion or pay increase, but a breakout from the dumping position.

16.     As the plaintiff complied with Shane Stone's instructions, the second shift general manager, Christopher Singleton, a Caucasian male, ordered the plaintiff to return to the line position to dump ingredients.  The plaintiff respectfully informed Christopher Singleton that he had been bidding on other positions after working the dump position for more than a year and had been sent to the floor position by his supervisor, Shane Stone.

17.     Christopher Singleton responded, "There's the door!".

18.     The plaintiff returned to the line 8 position and resumed dumping fifty (50) pound bags of ingredients as ordered.

19.     On or about December 17, 2019, the plaintiff called the corporate hotline and asked to confidentially report the incident involving Christopher Singleton.  The plaintiff reported that Christopher Singleton spoke to him in a degrading and hostile manner and nearly fired him for working in another area, although he was instructed to do so by his immediate supervisor and for mentioning opportunities for him to also move to the other positions he had been bidding on, considering his experience.  At the end of the report, the plaintiff was asked for his badge number. Believing the report was confidential as requested, the plaintiff gave the corporate representative his badge number as requested.

20.     On or about December 19, 2019, the plaintiff was summoned to meet with Danette Walton, the local human resource manager, an African American female.  In that meeting, the plaintiff learned that his report to the hotline was not kept confidential.  Danette Walton warned

the plaintiff that the supervisors knew his identity and the contents of his report, and then asked him if he was sure he wanted to proceed.  The plaintiff declined out of fear of losing his job, since Christopher Singleton had threatened to fire him a couple of days prior.

21.     On or about, January 8, 2020, Shane Stone, the plaintiff's line supervisor, instructed the plaintiff to report to work in the ingredients room, upon the request of Evan Wakefield, the first shift general manager, a Caucasian male.

22.     The plaintiff, in this position, was required to wear steel toe boots and responsible for driving forklifts and stand-up jacks to position and transfer heavy pallets of ingredients for use in the cook room, unload trucks of bulk ingredients, stack heavy pallets at least three levels high, and remove and replace large waste tanks. The defendant furnished the plaintiff with a one hundred ($100) voucher to purchase a pair of steel toe boots as required for the job. Of the three (3) employees in the ingredient room, the plaintiff was the only African American, while the other two employees were Caucasian.  The position usually included a pay raise, but the plaintiff did not receive a pay increase.

23.     The plaintiff worked the ingredients room position for about 7-8 weeks and obtained certifications for the stand-up jack and the forklift within that time.

24.     On or about February 25, 2020, Chris Singleton ordered the plaintiff back to a line position to push meat and dump breading ingredients for lines 1-4, under the supervision of Jacob Renadar, a Hispanic male.  The plaintiff was the only employee of his white counterparts ordered back to line.

25.     The plaintiff's position in the ingredients room was filled with a Hispanic male.

26.     Soon after returning to the line position, the plaintiff was instructed by line 6 supervisor, Larry, a Caucasian male and former law enforcement officer, to use the stand-up jack and move pallets of ingredients.

27.     The plaintiff informed Larry that he was wearing rubber boots as required for the line position and did not have the required steel toe boots to operate the stand-up jack or perform ingredient room duties.  In response, Larry instructed the plaintiff to operate the stand-up jack anyway.

28.     The plaintiff immediately went to the HR department and reported the issue to Danette Walton, the HR manager. Walton told the plaintiff that he was correct and called Christopher Singleton, the second shift general manager, to her office.  She explained the situation and informed him that they were in violation of the Occupational Safety and Health Association's ("OSHA") personal protective equipment ("PPE") safety mandates. In response, Christopher Singleton told the plaintiff to listen to the supervisor even if it contradicted him.

29.     The plaintiff returned to the line and continued pushing meat and dumping ingredients, very confused about Christopher Singleton's statement.

30.     As second shift general Manager, Christopher Singleton, was the managing supervisor of the plaintiff's line supervisors, Shane Stone, Larry, and Jacob Renadar, all non-African Americans.  At some point, during the plaintiff's mistreatment, Shane Stone was moved to another area.

31.     After receiving notice of the OSHA violation from the HR manager, both Christopher Singleton and Larry, continued to take turns ordering the plaintiff off and on of the line position pushing meat and dumping ingredients to perform ingredients room duties operating

the stand-up jack and other jobs operating the forklift and standup jack that he had not been trained and did not have the required personal protective equipment for.

32.     Over the course of February, March, and April of 2020, the plaintiff continued to report the OSHA violations, hostile treatment, and demotion from the ingredients room position to the human resources manager, Danette Walton.  Additionally, the plaintiff reported that the white employees in the ingredients room did not want to perform the specific tasks of their job duties, Christopher and Larry refused to make them perform them, and ordered him off the line placing him in danger to perform them instead. Walton told the plaintiff that she would speak to the assistant plant manager, Josh King, a Caucasian male, about the matter.

33.     The plaintiff continued to work in a hostile work environment into the month of June to no avail.  Josh King never met with the plaintiff about the matter.

34.     During the weekend of June 6, 2020, the plaintiff became ill and did not report to work on Monday, June 8 and Tuesday, June 9, 2020.

35.     On Wednesday, June 10, 2010, the plaintiff called the defendant's designated phone line well in advance of the start of his shift that began at 4:30 pm to report that he would be absent, so he would not be in violation of the attendance policy for "no show" after three (3) consecutive days without calling in.

36.     The plaintiff also contacted his team leader, Diane White, by telephone to inform her that he would be absent.

37.     At about 4:50 pm on June 10, 2020, Diane White called the plaintiff to inform him that he was terminated after she reported the plaintiff's call to his line supervisor, Jacob Renadar, a Hispanic male.

38.     On June 10, 2020, the plaintiff also called the Human Resource manager, Danette Walton, who confirmed the plaintiff was terminated that day.  Danette Walton further informed the plaintiff that he was terminated because he went from 8 points to 17 points in violation of the defendant's attendance policy.

39.     The defendant's original version of its attendance policy is based on a point system that terminates an employee upon 14 unexcused points.  Each day absent equals one point.  Three (3) days of consecutive no shows without calling in or a doctor's excuse constitutes automatic termination.

40.     Previously, on or about mid-March 2020, the defendant, in response to the COVID19 pandemic and to mitigate the spread of the highly contagious and deadly disease, issued an announcement that it had relaxed its attendance policy and informed the plaintiff, along with all its employees, to stay at home if they were ill, test positive for COVID19 or had been exposed to COVID19. (**A copy of said "Protecting Team Members and Our Company" website announcement is attached to this complaint and is identified as Plaintiff's Exhibit "A"**)

41.     To the best of plaintiff's knowledge, there had been no other updates or modification to the attendance policy and its point system, in particular, when he was terminated.

42.     The defendant issued a statement to media outlets on or about June 2, 2020, the last week the plaintiff worked at the defendant's place of employment, that it was reinstating its policy that penalized absentee workers due to illness, with the exception of COVID19 like symptoms and illness.  (**A copy of said "Tyson reinstates policy that penalizes absentee workers" new article is attached to this complaint and is identified as Plaintiff's Exhibit "B"**)

43.     The plaintiff contends that he had accumulated 11 points by June 10, 2020, well under the 14-point limit, and was not presented the opportunity to provide information regarding his absence or illness.

44.     The plaintiff's last day of actually working was June 5, 2020, and he was not scheduled to work Saturday, June 6, 2020.  He further contends that he would have been terminated long before June 5, 2020, if the defendant's HR manager's calculations were correct.

45.     For nearly two (2) years, the plaintiff performed his job duties in an exemplary fashion, and received high praise for his performance, work ethic, and dependability until he pursued other positions with higher pay and working conditions like his white counterparts.

46.     The plaintiff performed his job duties in an exemplary fashion and longer than any African American in his entry level position, yet only received one (1) pay increase after his 90-day probation period, one (1) standard annual pay increase, and was denied every opportunity for promotion and pay increases despite his training, certification on the forklift and stand-up jack, and performance as an ingredients room worker for 7-8 consecutive weeks and as ordered by Christopher Singleton and Larry in violation of OSHA.

47.     The plaintiff did not receive a pay increase, compensation, or job title reclassification, after training, obtaining forklift and stan-up jack certifications, and working as an ingredients room worker like his colleagues, who are all Caucasians, and received pay increases effective upon acquiring the position.

48.     Instead, the plaintiff was demoted, subjected to a hostile work environment, placed in unsafe in violation of OSHA, denied opportunities for promotion and pay raises based on his race, and retaliated against for reporting the adverse and discriminatory treatment to management

when he was terminated on June 10, 2020, under the pretext of violating the defendant's attendance policy.

49.     On or about June 18, 2020, the plaintiff filed for unemployment benefits with the Arkansas Division of Workforce Services.  The defendant indicated the plaintiff was terminated due to absenteeism and job abandonment.

50.     On August 31, 2020, the Arkansas Division of Workforce Services issued a Notice of Agency Determination, in favor of the plaintiff, stating that the plaintiff was terminated "for reasons beyond his control. The [plaintiff] did make proper notification to the employer.  The [plaintiff's] actions did not constitute deliberate and willful intent against the best interest of the employer." (**A copy of said "Notice of Agency Determination" letter is attached to this complaint and is identified as Plaintiff's Exhibit "C"**)

51.      The defendant did not appeal the decision.

IV.

<u>Causes of Action</u>

52.     The plaintiff incorporates the allegations in paragraph numbered 1 through paragraph numbered 50, as though set forth word for word.

53.     The plaintiff was afforded less favorable terms and conditions of his employment with the defendant, on account of his race, in violation of Title VII of the Civil Rights Act of 1964 (as amended), which is codified at 42 U.S.C.S. § 2000e *et seq*.

54.     Furthermore, the plaintiff has been subjected to disparate treatment on account of his race, in violation of Title VII of the Civil Rights Act of 1964 (as amended), which is codified at 42 U.S.C.S. § 2000e *et seq*.

55.     The defendant's supervisors created a hostile work environment for the plaintiff by threatening to fire him, placing him in unsafe working conditions in violation of OSHA, and subjecting him to different terms and conditions than his white counterparts on account of his race, in violation of Title VII of the Civil Rights Act of 1964 (as amended), which is codified at 42 U.S.C.S. § 2000e *et seq.*

56.     The defendant's discriminated against the plaintiff when it demoted and excluded the plaintiff from promotions within the company to which he was qualified, and failed to compensate the plaintiff while working in said positions, on account of his race in violation of Title VII of the Civil Rights Act of 1964 (as amended), which is codified at 42 U.S.C.S. § 2000e *et seq.*

57.     The defendant's corporate hotline, Human Resource Manager, and plant manager allowed the discrimination and subjected the plaintiff to acts of retaliation for exercising his civil rights to report and protest discriminatory conduct of the defendant's supervisors and management by failing to investigate the discriminatory treatment, in violation of Title VII of the Civil Rights Act of 1964 (as amended), which is codified at 42 U.S.C.S. § 2000e *et seq.* and Arkansas Civil Rights Act (ACRA), A.C.A. 16-123-101, et. Seq.

58.     Due to the plaintiff complaining about acts of discrimination, he was subjected to acts of retaliation, and was also terminated from his place of employment with the defendant on June 10, 2020, under the false pretext of him violating the attendance policy, in retaliation for having complained about discrimination, and due to his race in violation of Title VII of the Civil Rights Act of 1964 (as amended), which is codified at 42 U.S.C.S. § 2000e *et seq.* and Arkansas Civil Rights Act (ACRA), A.C.A. 16-123-101, et. Seq..

59.     The plaintiff exhausted administrative remedies and on November 9, 2020, the plaintiff filed a Charge of Discrimination No. 493-2020-01950) with the Equal Employment Opportunity Commission (EEOC), contending that he had been discriminated against based on his race when he was subject to different terms and conditions than his white counterparts and discharged in retaliation for complaining about the discrimination.   (**See Charge of Discrimination attached herein as Plaintiff's Exhibit "D"**).

60.     In response to the Plaintiff's Charge of Discrimination (No. 493-2020-01950) that he filed with the EEOC, said agency issued him a "Dismissal and Notice of Rights" letter dated December 3, 2020, which *inter alia* gave the plaintiff the right to sue the defendant within 90 days from the date he received the above-mentioned letter.  (**A copy of said "Notice of Right to Sue" letter is attached to this complaint and is identified as Plaintiff's Exhibit "E"**).

61.     This cause of action is being brought within ninety (90) days of the plaintiff receiving his right-to-sue letter as referenced in paragraph 60 of this complaint.

V.

Damages

62.     Due to the above-mentioned acts of discrimination, the plaintiff has suffered mental anguish, embarrassment, lost wages, front pay, back pay, loss of medical coverage, other employment benefits, increased healthcare costs, all in a manner to be proven at trial.

63.     Plaintiff further reserves the right to amend this Complaint and to allege other federal and state law claims.

VI.

Jury Demand

48.     The plaintiff requests that this matter be tried before a jury of twelve (12) fair and

impartial citizens of this state.

THEREFORE, the plaintiff is seeking the following relief for the above mentioned described unlawful employment practices:

a.      declare that the plaintiff has been subjected to unlawful discriminatory practices;

b.      restored to the plaintiff's position with back pay, seniority, pension contributions, fringe benefits, etc., which he would have enjoyed had it not been for the wrongful termination or reinstatement at the defendant's Texarkana facility;

c.      reinstatement;

d.      punitive and compensatory damages;

e.      the cost of prosecuting this action;

f.      attorney's fees;

g.      and for all other equitable, legal, and just relief.

Respectfully submitted,

**/s/** Angilynn Taylor
Bar Number 2006212
Law Office of Angilynn Taylor, P.A.
718 s Main St, Ste B
Hope, Arkansas 71801
Telephone: 844.264.4529
Facsimile: 844.264.1800
E-mail: Ataylor@ataylorlawoffice.com

<u>CERTIFICATE OF SERVICE</u>

I, Angilynn Taylor, do hereby certify that a copy of the foregoing pleading was electronically filed with the Clerk of the United States District Court for the Western District of Arkansas - Texarkana Division, on the 4th day of March 2021, using the CM/ECF system, which is designed to send notification of such filing to the following:

> C T Corporation System
> 124 West Capitol Avenue, Suite 1900
> Little Rock, Arkansas 72201

**/s/**Angilynn Taylor

Home  |  News  |  News Releases

Share    

March 17, 2020

# Protecting Team Members and Our Company; Ensuring Business Continuity

## Note: The following is a message from Tyson Foods CEO Noel White to the company's team members.

**Springdale, Ark. – Mar. 17, 2020 –** Protecting team members and ensuring the continuity of our business are essential as we continue efforts to address COVID-19 (coronavirus). We've been actively monitoring this situation and are continually adjusting our approach as we learn more about the spread of this virus.

Tyson Foods' role as America's largest food company is critical, so ensuring we're able to continue producing food is essential. That's why we're taking additional measures to protect our people and our company.

**Travel**

Social distancing – avoiding mass gatherings and maintaining distance from others when possible – can help people avoid the virus. That's why Tyson Foods has implemented travel restrictions. Late last month Tyson Foods suspended all international business travel on commercial carriers. Effective immediately, we are suspending all U.S. commercial business travel. Exceptions must be approved by an Enterprise Leadership Team (ELT) member.

For the same precautionary reasons, we encourage you to avoid personal travel via cruise ships, airplanes and other common carriers.

Depending on where you travel, you may be subject to self-quarantine for 14 days when you return. You should consider this and your ability to work remotely before traveling.

**Visitors**

Your privacy is important to us. This website uses cookies to ensure you get the best experience on this website. To learn more about how to control your cookies, the categories of personal information we collect on this website, and how we use that information, please visit our privacy policy.

Learn More          Accept

Exhibit A

We're also implementing changes to help hourly team members, including:

- Relaxing attendance policies in our plants by eliminating any punitive effect for missing work due to illness.
- Waiving the 5 consecutive day waiting period for Short Term Disability benefits.
- Waiving the co-pay, co-insurance and deductible for doctor visits for COVID-19 testing as well as eliminating pre-approval or preauthorization steps.
- Waiving co-pays for the use of telemedicine.
- Relaxing refill limits for 30 day prescriptions of maintenance medication.

**Working Remotely**

In order to protect the health of our team members and ensure we can continue to support our food production supply chain; many team members in our U.S. corporate office locations will work remotely through March 27.

To ensure business continuity, management will determine what critical business personnel will be asked to continue working in the corporate offices while others operate from home. Your manager will inform you of your status. Those who work remotely will be expected to work just as they do when in our corporate offices.

**Food Safety**

I want to remind you that COVID-19 is not considered a food safety concern. The CDC SAYS "currently there is no evidence to support transmission of COVID-19 associated with food." USDA REPORTS "There is no evidence at this time to suggest that the Coronavirus is a foodborne pathogen." According to a STATEMENT FROM THE FDA, "we are not aware of any reports at this time of human illnesses that suggest COVID-19 can be transmitted by food or food packaging."

**Additional Adjustments**

We have a cross-sectional team of leaders meeting frequently to stay on top of the coronavirus outbreak. Since it's an ever-evolving matter, we will continue to adapt and adjust our approach as needed.

Thank you for your patience and cooperation as we work together through this unique situation.

  

Your privacy is important to us. This website uses cookies to ensure you get the best experience on this website. To learn more about how to control your cookies, the categories of personal information we collect on this website, and how we use that information, please visit our privacy policy.

Learn More        Accept

Careers

Investors

News

Contact Us

    

Copyright 2018 Tyson Foods, Inc. Trademarks and registered trademarks.

Privacy Policy   |   Terms of Use   |   Legal   |   CTSCA   |   Do Not Sell My Personal Information

Your privacy is important to us. This website uses cookies to ensure you get the best experience on this website. To learn more about how to control your cookies, the categories of personal information we collect on this website, and how we use that information, please visit our privacy policy.

**Learn More**      Accept

Case 4:21-cv-04012-SOH   Document 2   Filed 03/04/21   Page 18 of 23 PageID #: 19
3/2/2021
Tyson reinstates policy that penalizes absentee workers

# The Detroit News

**BUSINESS**

# Tyson reinstates policy that penalizes absentee workers

**Deena Shanker and Jen Skerritt** Bloomberg
Published 2:13 p.m. ET Jun. 3, 2020 | Updated 2:20 p.m. ET Jun. 3, 2020

Tyson Foods Inc., the biggest U.S. meat processor, will return to its pre-coronavirus absentee policy, which includes punishing employees for missing work due to illness. Workers with Covid-19 symptoms won't be penalized, the company said.

"We're reinstating our standard attendance policy," Tyson spokesperson Gary Mickelson said in an email. "But our position on Covid-19 has not changed: Workers who have symptoms of the virus or have tested positive will continue to be asked to stay home and will not be penalized. They will also continue to qualify for short-term disability pay so they can continue to be paid while they're sick."

In mid-March, Tyson said that it was "relaxing attendance policies in our plants by eliminating any punitive effect for missing work due to illness." That will no longer be the case, as the company shifts back to its usual policy that discourages absenteeism through a point system.

Some of America's largest meat suppliers reopened plants recently after a wave of coronavirus outbreaks forced temporarily closures in April, withering available supplies at grocery stores and driving up retail prices for beef and pork. While companies have taken measures such as increasing hand-washing stations, distributing face shields and doing temperature checks, experts and unions warn that workers are still being put in harm's way in the name of food security as packers seek to boost output.

Workers absenteeism has been high in some U.S. plants not just because employees are sick. Some are afraid to come in for shifts because of fears they will catch the virus. Under Tyson's policy, staying home for fear of exposure could result in punitive measures.

Physical distancing is nearly impossible in plants that operate processing lines at very fast speeds. There have been at least 44 meatpacking worker deaths and over 3,000 workers

Exhibit "B"

testing positive for Covid-19, according to estimates from United Food & Commercial Workers International Union.

"It is irresponsible to move away from strong protections, paid sick leave, and attendance policies that support worker well-being and public health goals," said Mary Beth Gallagher, executive director of Investor Advocates for Social Justice. "Instead, it appears the incentives and attendance policies further business objectives that may be out of step with keeping workers safe."

Tyson reiterated that its "position on Covid-19 has not changed," in an emailed statement.

"Team members who test positive for the virus or have Covid-19 symptoms receive paid leave and may return to work only when they've met the criteria established by both the CDC and Tyson."

On Tuesday, Tyson confirmed 591 positive Covid-19 cases out of 2,303 tested employees at its Storm Lake, Iowa, plant, which was shuttered last week. Limited production at the facility will resume on June 3, the company said, while separately confirming 224 positive cases out of its 1,483 employees at its Council Bluffs, Iowa plant.

Mickelson also noted the steps the company has taken to slow the spread of the virus at its plants. These measures include pre-shift temperature checks, providing masks to workers, and creating physical barriers between workstations.

(Updates with analyst comment, additional Tyson comment starting in seventh paragraph)

2020 Bloomberg L.P.

*AAS578C+472635924202025061*

8/28/2020 11:56 AM

## ARKANSAS DIVISION OF WORKFORCE SERVICES
## NOTICE OF AGENCY DETERMINATION

Mailing Date Of Notice: 8/31/2020
Local Office No:         00190
Initial Claim:           06/18/2020
SSN:***-**-6274          BYQ:20202

KENNETH C ANDERSON
502 BELT RD. APT. 28
TEXARKANA TX 75501

TYSON POULTRY INC
PO BOX 283
ST LOUIS MO 63166

**FINDING OF FACTS:** The claimant was discharged on 6/10/2020 due to absenteeism for reasons beyond his control. The claimant did make proper notification to the employer. The claimant's actions did not constitute deliberate and willful intent against the best interest of the employer.

**DECISION:** Not disqualified. ***Importante: Este documento(s) contiene información importante acerca de su derecho de compensación por desempleo, responsabilidades y/o beneficios. Es muy importante que usted entienda la información contenida en este documento. Si necesita ayuda en la traducción y comprensión de esta información, por favor repórtese a su oficina local de inmediato. Si usted no está de acuerdo con esta determinación o decisión, debe presentar una apelación antes del plazo límite especificado en la determinación o decisión.

**LAW:** ACA § 11-10-514(a) provides that an insured worker will be disqualified from receiving benefits if he or she is discharged from his or her last work for misconduct in connection with the work. ACA § 11-10-514(a)(2) provides that in cases of discharge for absenteeism, the individual shall be disqualified for misconduct in connection with the work if the discharge was pursuant to the terms of a bona fide written attendance policy, regardless of whether the policy is a fault or no-fault policy.

**APPEAL RIGHTS:** ACA §11-10-524(A) provides that a party entitled to this notice may file an appeal within 20 calendar days after the mailing of the notice to his last known address. An appeal may be filed by either completing a written appeal form (which may be obtained from any Division of Workforce Services Office or at https://www.dws.arkansas.gov/unemployment/appealing-ui-determination/) or by writing to the Arkansas Appeal Tribunal, P.O.Box 8013, Little Rock, AR 72203. Please attach a copy of this form to the appeal letter and continue to file weekly claims to protect your benefit rights. All correspondence relating to an appeal should include the claimant's Social Security number. More information regarding the unemployment insurance program may be found in UI handbook, at www.dws.arkansas.gov or the local office listed below.

TIMELY :    N
514A2X02
CLAIMANT COPY

FAX: 903-792-0983   PHONE: 870-216-4011
DIVISION OF WORKFORCE SERVICES
1702 HAMPTON ROAD
TEXARKANA, AR 75503-2598



*** Servicios de Interpretación/Traducción disponibles por medio de su oficina local. --- Ewōr Jerbal in ukok ikijien jeje im kennaan ilo opij ko ijo kwoj pād ie.
--- Các Dịch Vụ Thông Dịch/Phiên Dịch có sẵn qua văn phòng địa phương của quý vị. --- ꦩꦤꦠ꧀ꦠꦿ ꦁꦫ꦳ꦴ ꦲꦷ ꦏ ꦧꦺꦴꦴ ꦧ꧀ ꦧ ꦧꦴꦴꦴ
--- Interpretation/Translation services available through your local office.***

AAS578C    3.0.10

Page 1 of 1

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA<br>☒ EEOC | **493-2020-01950** |
| | | and EEOC |

State or local Agency, if any

| Name (indicate Mr., Ms., Mrs.) | Home Phone | Year of Birth |
|---|---|---|
| **MR. KENNETH C ANDERSON** | **(903) 490-9162** | **1980** |

| Street Address | City, State and ZIP Code |
|---|---|
| **502 BELT ROAD, APARTMENT 28, TEXARKANA,TX 75501** | |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| **TYSON FOODS** | **501+** | **(870) 845-1455** |

| Street Address | City, State and ZIP Code |
|---|---|
| **100 EAST CASSIDY, NASHVILLE, AR 71852** | |

| Name | No. Employees, Members | Phone No. |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

DISCRIMINATION BASED ON (Check appropriate box(es).)

☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☒ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION
☐ OTHER (Specify)

DATE(S) DISCRIMINATION TOOK PLACE
Earliest **01-06-2020**   Latest **06-10-2020**

☐ CONTINUING ACTION

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

**I was hired October 22, 2018, and last worked as Ingredient Room Attendant. My supervisor (White) had me doing jobs I was not trained to do and directed me to perform tasks two coworkers (White) did not want to do. I complained to the Hotline, Corporate, and Human Resources (Black). HR told me that they know my complaints because of my badge number and asked was I sure I wanted to proceed. I was afraid and did not. The GM told me he would micromanage me and to do whatever my supervisor told me to do and him, too if it contradicted him. After Covid began, employees were told not to come in if they felt bad. I called in to the hotline on June 10, 2020, hours before my shift. I also called my supervisor a few minutes after my shift. I was terminated June 10, 2020. Even with the last call in I would not have exceeded by attendance points.**

**I was told I failed to call in.**

**I believe I was harassed ad subjected to different terms and conditions because of my race**

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Agency Requirements |
|---|---|
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Digitally signed by Kenneth Anderson on 11-09-2020 11:51 AM EST** | SUBSCRIBED AND SWORN TO BEFORE ME (month, day, year) |

EEOC Form 5 (11/09)

| CHARGE OF DISCRIMINATION | Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|---|
| This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form. | ☐ FEPA ☒ EEOC | 493-2020-01950 |

_____ and EEOC

*State or local Agency, if any*

**(Black) and was discharged in retaliation for complaining; all in violation of Title VII of the Civil Rights Act of 1964, as amended.**

| | |
|---|---|
| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – *When necessary for State and Local Agency Requirements* |
| I declare under penalty of perjury that the above is true and correct. | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. SIGNATURE OF COMPLAINANT |
| **Digitally signed by Kenneth Anderson on 11-09-2020 11:51 AM EST** | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (*month, day, year*) |

EEOC Form 161 (11/16)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

| To: Kenneth C. Anderson | From: Little Rock Area Office |
|---|---|
| 502 Belt Road, Apartment 28 | 820 Louisiana |
| Texarkana, TX 75501 | Suite 200 |
| | Little Rock, AR 72201 |

☐    *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **493-2020-01950** | **Rodney E. Phillips,**<br>**Investigator** | **(501) 324-6473** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐    The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐    Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐    The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐    Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒    The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐    The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐    Other *(briefly state)*

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_____      12-03-2020

Enclosures(s)      **William A. Cash, Jr.,**      *(Date Mailed)*
**Area Office Director**

cc:
**Olivia McClellan**
**Sr. EEO Specialist**
**TYSON FOODS, INC.**
**2200 Don Tyson Pkwy, CP422**
**Springdale, AR 72762**